UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| SAMUEL R. LARGE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL NO.  1:02cv177 |
| | ) | |
| MOBILE TOOL INTERNATIONAL, INC., | ) | |
| MTI INSULATED PRODUCTS, INC., | ) | |
| TECO, INC., and OCET, INC., | ) | |
| | ) | |
| Defendants. | ) | |

OPINION AND ORDER

This matter is before the court on a motion for sanctions filed by the plaintiff, Samuel R.

Large ("Large"), on September 7, 2006.  The defendants (collectively referred to as "the Mobile

Tool Defendants" or simply "Mobile Tool"), filed their response on October 3, 2006 and also

filed, on this same date, a motion to strike the motion for sanctions.  Large filed his reply with

respect to the motions for sanctions on October 13, 2006 and responded to the motion to strike

on October 19, 2006.  Mobile Tool filed its reply with respect to the motion to strike on

November 1, 2006.  The court held a hearing on the motion for sanctions on June 25, 2007.

Further briefing was filed on August 27, 2007 by Mobile Tool, and on August 28, 2007 and

September 12, 2007 by Large.

Additionally, on October 26, 2007, Mobile Tool filed three Daubert motions, and Large

filed one Daubert motion.  The court held a hearing on these motions on November 8, 2007 and

entered an order ruling on the motions on December 27, 2007.

For the following reasons the motion to strike will be denied and the motion for sanctions

will be granted.

<u>Discussion</u>

Large was seriously injured on June 19, 2000 near Danville, Virginia while using a TECO Vanguard V5-A bucket truck.  Large, a twenty-year lineman, was employed by the lessee of the truck, Davis H. Elliot, Inc. ("Davis Elliot").  As a result of his injuries, Large instituted an action against Mobile Tool and others, for negligent design and/or manufacture, product liability, and breach of express and implied warranties.

Mobile Tool investigated the accident within days of Large's injury.  Mobile Tool's Vice President of Engineering, Dave Grabner was apparently the head of the investigative team. Grabner's field notes diagramed specific product observations.  He pointed out that the "leveling rod was missing hose clamp."  (Ex. A.)  He observed that while "[t]here are burned tool hoses just below the elbow", "most hoses from this point to the burned ends look pretty good."  <u>Id</u>.  He noted that while the top of the inside of the fiberglass boom was "oily/smoke filled," that "the [b]ottom is pretty clean."  <u>Id</u>. Finally, Grabner noted that the "[c]enter core [is] burned out of coax."  <u>Id</u>.  Grabner indicated no conclusions as to cause or fault of the accident.

Following his investigation, Grabner returned to Indiana.  Grabner oversaw the process of notifying Mobile Tool's carrier, Great American Insurance company, of the Large claim. Mobile Tool maintained a $1 million indemnity policy with Great American, and also carried a $25 million excess insurance policy with Transcontinental Insurance Company.

Davis Elliot took appreciable measures to preserve the boom.  It moved the parts to a dry and secure facility, with the intent of keeping them indefinitely.  (Scruggs Dep. at 28, 119-120). In the fall of 2001 Mobile Tool demanded the boom back.  Mobile Tool transported the boom parts from Virginia to Fort Wayne.  Upon arrival, the boom was parked in the back lot of

2

TECO/Mobile Tool.  The parts were laid out on top of the truck chassis in the open air, but on Mobile Tool's property.  (Weikart Dep. at 14).

The boom drew attention on the Mobile Tool lot.  Steve Weikart, maintenance foreman, asked leasing supervisor Brad Bowditch why it was there.  Bowditch said it had been involved in an accident.  (Weikart Dep. at 15).  According to Mobile Tool executive Mike Harrelson, Grabner directed that the unit be safeguarded "in case someone did need it for an accident investigation."  (Harrelson Memo, Plaintiff Ex. I).  Walbridge reportedly stated that the boom and parts were "specifically being preserved as evidence in the investigation of Mr. Large's accident."  (Affidavit of Christopher Hess, at ¶ 4).

On or about October 28, 2001, a maintenance crew overseen by Weikart tore down and rebuilt the damaged boom.[1]  In October 2002, Weikart's crew affixed new fiberglass to a new metal knuckle, and positioned new leveling rods, fresh hoses and other components in the upper boom.  (Weikart Dep. at 52).  Weikart had authority to dispose of parts from normal boom rebuilds, but viewed this boom differently because of the accident.  (Weikart Dep. at 36).  Since it was a leased unit, he asked leasing supervisor Bowditch what to do with the replaced parts. Bowditch told Weikart to scrap the parts.  (Weikart Dep. at 35).  Weikart then asked Bowditch specifically about the metal knuckle that separated the upper and lower booms, knowing this part cost in the thousands of dollars.  (Weikart Dep. at 52-53).  Weikart also knew that Mobile Tool usually re-used expensive knuckles when "re-fiberglassing" booms.  (Weikart Dep. at 55-56). Weikart received the same orders: "I was instructed to scrap [the knuckle]."  (Weikart Dep. at

---

[1]  The work was performed by members of Weikart's crew, comprised of Steve Heiny, Justin Seitz and Bill Johnson.  (Weikart Dep. at 30).  They were all Mobile Tool employees, who later moved to NEUCO, a subsidiary of aerial lift manufacturer Altec.

56.)  Weikart's team tossed the boom components in a dumpster and a waste contractor hauled them away to a land fill.[2]

Large filed suit against Mobile Tool on May 28, 2002.  On July 8, 2002, Mobile Tool answered, denying liability.  Mobile Tool later impleaded Davis Elliot as a third party defendant, alleging contractual indemnity.  Davis Elliot filed a counterclaim against Mobile Tool, asserting spoliation.

On September 17, 2002, with leave of court, Large's counsel took the expedited deposition of Van Walbridge, to determine other potential defendants in the case.  In a sidebar conversation about the location of the boom, Walbridge admitted to Large's counsel, with Mobile Tool's counsel present, that Walbridge learned in early 2002 that the boom had been destroyed.  (Hess Aff.).

On September 19, 2002, Mobile Tool's counsel talked with Mike Harrelson to learn about Harrelson's inquiry into the disposal of the boom.  Harrelson had performed, at counsel's request, an investigation into that occurrence.  Harrelson had used as his sources conversations with Grabner, Bowditch, and Weikart.  Harrelson's resulting September 20 memo was addressed to Mobile Tool counsel, Bill Posey, with a copy to Walbridge.

On September 30, 2002, ten days after the Harrelson Memo, Mobile Tool filed for bankruptcy protection.  On February 9, 2004, this case reopened, and on February 26, 2004, Large served his Second Requests for Production.  Mobile Tool neither objected to, sought an

---

[2]  Davis Elliott was supposedly billed $29,297.00 for the rebuild of the boom; Davis Elliot's CEO, Glenn Thomsen, testified that he was never called upon to pay.  When Thomsen learned of the destruction by Mobile Tool of the parts, he was "very surprised by Mobile Tool's actions."  (Thomsen Dep. at 55).

extension to, nor answered this discovery.

On December 20, 2004, Large filed an amended complaint, asserting as a separate claim the spoliation by Mobile Tool of the boom.  On August 12, 2005, Large served his Second Set of Interrogatories and his Third Requests for Production of Documents.  Once again, Mobile Tool neither objected to, sought an extension to, nor answered this discovery.

On September 20, 2005, Mobile Tool finally served its Rule 26(a)(1) disclosures.  Mobile Tool represented that its answers were made "upon a good faith review of information reasonably available to [Mobile Tool] at this time . . . ."  Rule 26(a)(1)(A) required disclosure of:

> [t]he name, and if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses. . ."

In response, despite having the Harrelson Memo, Mobile Tool named no individuals.

Rule 26(a)(1)(B) required the disclosure of "all documents . . . that are in the possession, custody or control of the party . . . that the party may use to support its claims or defenses. . . ."  Mobile Tool responded that: "[d]efendant's documents were sold through the bankruptcy proceedings to a third party, Altech [sic].  Defendants have provided documents to Plaintiff or its counsel, and any other relevant or responsive documents in the possession of the Bankruptcy trustee will be provided."  However, nothing else was provided to Large by Mobile Tool, or by the Trustee.

Large moved to compel responses to the long-delinquent discovery.  Mobile Tool defended against Large's motion by once again contending it had no "control" over Mobile Tool witness or documents, due to the bankruptcy of Mobile Tool and the sale of assets to Altec.  Large, however, discovered that the bankruptcy documents completely contradicted Mobile

5

Tool's position.  The Asset Purchase Agreement between Mobile Tool and Altec became effective on May 8, 2003, and states:

> The parties acknowledge that after Closing, [Mobile Tool] or [Altec], or their respective successors, may need access to information or documents in the control or possession of the other party . . . to prosecute or defend third party claims. With respect to defending third party product liability claims, such information and documents shall include, without limitation, all manufacturing records, engineering drawings, sales correspondence, QA records, and all information associated with manufacturing, design, testing and servicing of products.

(Asset Purchase Agreement at 9.1(a)).

Further in 9.1(c) the parties agreed that the Mobile Tool records would be made "available for inspection and copying" with respect to "any" ongoing litigation.  As to witnesses, in 9.1(b) Altec agreed "to use its best efforts to cause its former and present directors, officers and employees to cooperate with the other party on and after closing in furnishing information, evidence, testimony and other assistance in connection with any action, proceeding, arrangement or dispute of any nature. . . ."[3]

The Asset Purchase Agreement was a well-known document to Mobile Tool- - it was signed by Van Walbridge, in his capacity as both CEO and President.  The Asset Purchase Agreement was also known to Mobile Tool's counsel.  In opposition to Large's motion to compel, counsel wrote: "Mobile Tool assets were sold in an asset purchase agreement approved by the bankruptcy court.  All documents of Mobile Tool were sold as part of the asset purchase agreement.  Mobile Tool therefore has no employees and has no documents under its control or

---

[3]  Mobile Tool not only secured access to its documents through the Asset Purchase Agreement, but it also preserved control.  The parties agreed that for four years, or until May 2007, Altec must refrain from destroying any Mobile Tool records.  If Altec wished to retire any records thereafter, it had to give Mobile Tool sixty days advance notice before doing so.  (Asset Purchase Agreement at 9.1(c).

possession."

After the Asset Purchase Agreement surfaced, Large won his motion to compel.  On December 8, 2005, this Court ordered Mobile Tool to answer the "long-standing written discovery requests."  This Court determined that fact discovery was closed as of November 1, 2005, "with the exception of Mobile Tool's responses to the outstanding interrogatories and discovery requests (and such other discovery as Large and [third party defendant] Davis Elliot may be doing)."  Further, noted the Court, "Mobile Tool's responses will be ordered due in thirty days, assuming they are satisfactory, that will end discovery.[4]

On the last day permitted for its response, January 6, 2006, Mobile Tool served the long-ignored discovery responses.  Mobile Tool's responses were thin and general.  Instead of providing specific answers to most questions, Mobile Tool indicated, in a fax the preceding day, that it was making available approximately 1,000 boxes of documents in Colorado and Indiana, as "Rule 33(d)" responses to Large's discovery.

Mobile Tool did produce some documents directly, and Large was very surprised at some of this content.  Mobile Tool released, for the first time, Grabner's accident investigation notes – over 60 days after the discovery cut off, and almost two years after they were first responsive to discovery.  Mobile Tool also produced for the first time portions of the 4068 "unit file".  It contained manufacturing reports specific to the vehicle, business and lease documents and some repair records.  The file further included select repair manuals, safety bulletins, design documents and production inspection documents.  Other items in the newly-produced material

_____

[4]  The Court subsequently extended medical discovery in this case, in deference to Large's ongoing and evolving medical care.

7

pointed to CEO Walbridge's sophistication in matters of accident investigation.[5]

Far more surprising to Large, though, were the number of discovery responses Mobile Tool willfully elected not to make – even though it was under Court order to respond. Plaintiff's Second Set of Interrogatories, No. 7, directed Defendants to: [i]dentify all entities and people employed, retained or contracted by Mobile Tool that came into contact with the Truck or any of its parts following the Accident." Interrogatory No. 8 directed Defendants to "[i]dentify the circumstances and people or entities involved therein under which any part of the Truck was lost, misplaced, destroyed, discarded or disposed of by Mobile Tool or its contractors following the accident". Mobile Tool answered both interrogatories by incorporating its response to Interrogatory No. 8. Mobile Tool objected to Interrogatory No. 8, both generally and specifically, and then identified no individual involved in the scrapping by Mobile Tool of the re-built boom and parts.[6] Mobile Tool stated that "the metal components were refiberglassed

---

[5] In a folder, called "Electrical Injury," in a section of documents marked "Van's file", Walbridge kept an article from the August 1987 issue of Transmission and Distribution magazine. It was entitled "Document Accident Data - Immediately." On page 34, the article advised "[o]nce any evidence [of an accident] is gathered, preserve it under lock and key until the statute of limitations runs out in the particular jurisdiction. (MTI-Large-018122). Notes on the face of the file copy of the article read "VAN FYI." (MTI-Large-018120, Ex. M.).

[6] Large asserts that this recalcitrance was calculated and unscrupulous. Large learned from Mobile Tool much later, well after the November 1, 2005 discovery cut off, that there were a bevy of TECO/Mobile Tool folks that had jobs germane to the issues in this suit. Dale Bowser was Mobile Tool's Production Supervisor at critical points in this case, Donny Harris was in Small Parts Assembly, Chris Caither was Fabrication Supervisor, Conrad Deihl headed Quality Control, and Brian Hess the Fiberglass Department. Weikart was the source of all this information, at a deposition Large took after Weikart was named by Mobile Tool as a putative FRE 702 witness on March 15, 2006, and deposed on May 3. (Weikart Dep. at 16). Large asserts that Weikart was available and known to Mobile Tool's counsel in 2002. Mobile Tool made use of Weikart in discovery planning in "April or May of 2005" when Mobile Tool counsel called Weikart looking for this very 4068 unit file. (Id.) This was during the period Mobile Tool claimed it had no access or control to documents or persons responsive to Large's discovery.

and put back in the unit." The knuckle is one such metal component. According to the interrogatory answer, the "hoses" and other stored parts were also disposed of in a landfill.

Large notes that Weikart flatly contradicted Mobile Tool's answer to Interrogatory No. 8 in his deposition. Weikart was named by Mobile Tool on March 15, 2006, as a defendant's "technical" witness, ostensibly to help jurors understand how the leveling chain on a TECO Vanguard V-5A was supposed to be maintained, and how TECO's bucket truck production processes and documentation worked. (Large Exhibit N, at ¶¶ 8, 9). In order to inform its various motions to oppose this type of testimony, Large deposed Weikart, along with all the other experts Mobile Tool identified in the case.

Large asserts that because of the destruction of the boom, the dearth of document and witness production, and delay, he has had less than the desired amount of product and process information to put before its liability expert, John Dagenhart. Large acknowledges that Dagenhart did examine the notes Grabner made at the accident scene. Dagenhart concluded from the notes, from designs, and from manuals, that the fire engulfed the truck on account of one of three probable scenarios. (Large Exhibit O).

First, Dagenhart determined that there were design and warning flaws in the metal test band installed by TECO on the otherwise-insulated portion of the upper boom. The test band was fastened on the boom for the convenience of the manufacturer and utility customers. It allowed them to hook up a meter to the band, which was wired to the co-axial cable and metal connector on one end, and to the metal knuckle on the other. Any stray current in the upper boom would register through the co-axial cable and metal connector to the test band, where technicians could monitor levels. According to Dagenhart, this test band assembly was the weak

link in this chain of conductivity in this upper boom area.  Mobile Tool insulated the boom for

69,000 volts, but the test band, connector and co-axial cable assembly could carry but 1,900

volts before melting.  Dagenhart concluded that, given the foreseeable contact with charged

wires, the co-axial was bundled improperly with the hydraulic hoses carrying flammable fluid,

that TECO/Mobile Tool had a duty to warn of this latent fire hazard.  According to Dagenhart,

these hazards were all foreseeable at the time of manufacture and thus constitute a design defect.

(Dagenhart Dep. Ex. 1 at 2-3).

Second, Dagenhart determined, from design specifications, that a small-bore "retractile

cable" designed by TECO into the truck to capture and monitor stray current on hoses and

leveling rods in the upper boom apparatus, had been improperly secured to the "leveling rod" in

the upper boom with a clamp connection joining dissimilar metals.  TECO standards disallowed

the joining of dissimilar metals for reason of corrosion.  Dagenhart also determined, based on

Grabner's post-accident memorandum, that one of the retractile cables was "missing" from the

leveling rod.  Whether because of poor TECO assembly practices, or TECO installation error, a

flopping retractile cable would have been an electrical pathway for the current coming in through

the test band to bridge the two-inch gap that was supposed to have separated the metal knuckle

from the test band.

According to Dagenhart, if the retractile cable bridged to the knuckle, it would form a

circuit, inducing a volatile arc of current, and would heat up the nearby hydraulic hoses to the

point of fire.  Dagenhart indicated that visual evidence of burn marks on the knuckle would

easily determine if the retractile cable had been the source of the arc, and that such marks would

be long-lasting.  Without the metal knuckle, Dagenhart could not corroborate this physical

pathway; with the knuckle, Dagenhart and Steve Reynolds agree, one could determine if there were "witness marks" on it, which would prove the flopping retractile cable as the point of boom failure.  Dagenhart states that such a scenario would constitute a manufacturing defect. (Dagenhart Dep. at 3-4).

Third, Dagenhart concluded that the end cap was missing on unit 4068, which would have permitted debris, like phone wire or pliers to fall down the end cap opening, and bridge the insulation gap separating the test band from the knuckle.[7]

On May 5, 2006, in an attempt to finish discovery, and find out who spoliated the evidence in this case, and where the decision to destroy was made, Large filed his Motion to Compel Complete Responses to Court-Ordered Discovery (DE# 137).  Large moved to compel the Harrelson Memo that Mobile Tool had withheld from discovery.  The court granted Large's Motion to Compel.  Mobile Tool did not appeal and produced the document on June 23, 2006.

Large argues that due to Mobile Tool's conduct as discussed above, Mobile Tool should be sanctioned by an entry of a default judgment.  When a defendant attempts to gain strategic advantage by violating litigation duties, by ignoring court rules, and by flouting court orders, its

---

[7] The May 3, 1996 TECO inspection report first produced by Mobile Tool in the 4068 unit file, identified a missing end cap.  The unit file contains no document showing that the end cap was ever actually installed before unit 4068 was sent to Davis Elliot in late May 1996. There is in the unit file a later inspection report called a "Test Report".  Defense experts understood this to be the final quality control inspection on the unit, but it was not.  It was a final paint department report, attesting to the efficacy of the paint job.  In any event, argues Large, the paint department's Test Report does not indicate that the end cap was specifically installed before unit 4068 was released to Davis Elliot, and Davis Elliot's personnel have denied any knowledge that there was ever an end cap in place.  Large again argues that, if bridging debris caused this fire, witness marks on the knuckle would quickly show this.  (Dagenhart Dep. Ex. 1 at 3; Dagenhart Dep. Vol. 1 at 195.21-197.1; 202.10-203.6; 205.14-206.11).

case may be dismissed out of fairness to its adversary, and in order to protect the judicial

process.  Chambers v. Nasco, Inc., 501 U.S. 32, 44 (1991).  Large maintains that Mobile Tool, in

a quiet but direct fashion, has openly pursued a strategy of delay and deception to frustrate the

development of Large's case.  Large notes that a federal court can sanction such conduct by

resorting either to the court's "inherent power" to impose sanctions, or by proceeding under

Federal Rule of Civil Procedure 37.[8]  (Id., 501 U.S. at 42-43 (1991)).

Courts have ruled that "contumacious conduct" merits strong sanctions.  See, e.g.,

Marrocco v. General Motors Corp., 966 F.2d 220 (7th Cir. 1992); Langley v. Union Elec. Co.,

107 F.3d 510 (7th cir. 1997); Patterson v. Coca Cola Bottling Co., 852 F.2d 280, 283 (7th Cir.

1988); Hal Commodity Cycles Mgmt. Co. v. Kirsh, 825 F.2d 1136, 1138 (7th Cir. 1987).

"Contumacious" means "stubbornly disobedient" or "rebellious".  Webster's Ninth New

Collegiate Dictionary 286 (1989).  When the court uses its inherent power to root out

contumacious conduct, no showing of willfulness, bad faith, fault or even prejudice is required.[9]

Large argues that although there was a day when dismissal was a disfavored approach to

recalcitrance, those days are gone.  Metro. Life Ins. Co. v. Estate of Cammon, 929 F.2d 1220,

1224 (7th Cir. 1991).  After the Supreme Court's decision in Nat'l Hockey League v. Metro.

Hockey Club, 427 U.S. 639 (1976), courts became more resolute.  Metro. Life, 929 F.2d at 1224.

---

[8]  "Whether proceeding under Rule 37 of the Federal Rules of Civil Procedure or under a
court's inherent powers, the analysis is essentially the same."  Danis v. USN Commc'ns., Inc.,
No. 98 C 7482, 2000 U.S. Dist LEXIS 16900 (N.D. Ill. Oct 20, 2000)(citing Cobell v. Babbitt,
37 F. Supp. 2d 6, 18 (D.D.C. 1999)).

[9]  As Judge Posner put it, "[t]he cases in this circuit . . . do not set up a row of artificial
hoops labeled 'bad faith' and 'egregious conduct' and 'no less severe alternative' through which
a judge must jump in order to be permitted to dismiss a suit."  Newman v. Metro. Pier &
Exposition Auth., 962 F.2d 589, 591 (7th Cir. 1992).

Federal trial courts are now given wide latitude to deploy default judgments as a sanction.[10]

Large points out that there are numerous reported cases just like the case at bar – in which litigants have ignored discovery until it suited them to respond, have destroyed evidence, have refused to open their files to witness and document identification, have wrongly masked non-privileged information, and have violated direct court orders.   Large argues that any one of those things could and has triggered default or dismissal and, in the present case, everyone one of them occurred in the same case.  Large contends that, taken together, they add up to a case warranting default.

Mobile Tool has moved to strike the motion for sanctions.  Mobile Tool contends that the motions for sanctions "is really a disguised discovery motion that is untimely."  This contention is misdirected because Large is not asking for discovery at this point.  Rather, Large is seeking sanctions for an ongoing pattern of alleged discovery abuses. Large also takes issue with Mobile Tool's assertion that the motion for sanctions is untimely, noting that Mobile Tool has cited no authority for its position.  Large points out that a party can file a sanctions motion under Rule 37 at any time.  Brandt v. Vulcan, Inc., 30 F.3d 752, 756 (7th Cir. 1994).  When it comes to sanctions motions, the important consideration is justice.  "The court has the inherent authority to sanction a party for misconduct, including prelitigation spoliation, in order to protect the integrity of the judicial system and prevent abuses of the discovery process."  Smith v. Borg

---

[10]  Circuit courts review such decisions on an abuse of discretion standard.  Nat'l Hockey League, 427 U.S. at 642-43.  The district court need not even hold an evidentiary hearing when the evidence submitted with the motion is sufficient.  Langley, 107 F.3d at 515 (citing cases).  The trial court's findings of fact are reviewed on the "clearly erroneous" standard.  United States v. Di Mucci, 879 f.2d 1488, 1494 (7th Cir. 1989).  Sanctions will be upheld unless "it is clear that no reasonable person would agree [with] the trial court's assessment of what sanctions are appropriate."  Marrocco, 966 F.2d at 223.

Warner Automotive Diversified Transmission Corp., 2000 U.S. Dist LEXIS 10200 *20 (D.IN

2000).  Accordingly, Mobile Tool's motion to strike will be denied.

In support of his request for default[11], Large reiterates that Mobile Tool intentionally

destroyed the boom in violation of its duty to preserve material evidence.   Large claims that in

October 2001, Mobile Tool intentionally ordered the destruction of the remnants of the upper

boom following the re-fiberglassing operation.  These parts included the burned hoses, melted

fiberglass, allegedly-charred coaxial cable, test band connector, test band and metal knuckle.

Large contends that Mobile Tool knew, through Grabner, the circumstances of Large's June

2000 accident, knew that Mobile Tool's own accident investigation was not yet completed, knew

that Walbridge had a Mobile Tool corporate directive in place to preserve the evidence, knew

that the evidence should be kept at least as long as the unexpired statute of limitation, and knew

the value of the boom as physical evidence to the investigation and prosecution of its own

defense to any claim Large might bring.

A litigant's duty to preserve evidence pre-suit is governed by state, not federal law.

Allstate Ins. Co. v. Sunbeam, 53 F.3d 804, 806 (7th Cir. 1995).  "Indiana law [contains] important

sanctions that not only provide remedy to persons aggrieved, but also deterrence to spoliation of

---

[11]   In the alternative, Large requests that the court exclude certain of Mobile Tool's
witnesses, documents and evidence, and to prohibit the cross examination of Large's experts.
Large argues that Mobile Tool should be barred from using at trial all the evidence that it
suppressed or destroyed pre-trial.  Large further argues that Mobile Tool's expert opinions
would likely be contradicted by the physical evidence that was destroyed, and thus Mobile
Tool's expert witnesses should be barred from testifying.  Finally, Large argues that to prevent
Mobile Tool from profiting from its misconduct, Large should be permitted to present its case
through only untainted evidence, i.e., by barring Mobile Tool from cross-examining Large's
liability experts.
    Large also requests, as a minimum sanction, that the jury be given an adverse inference
instruction concerning the destroyed evidence.

evidence by litigants and their attorneys." <u>Gribben v. Wal-Mart Stores, Inc.</u>, 824 N.E.2d 349, 351 (Ind. 2005). Under Indiana law, a party may not lose, destroy or suppress material facts or evidence "prior to the commencement of the lawsuit that the party knew or should have known was imminent." <u>Porter v. Irvin's Interstate Brick & Block Co.</u>, 691 N.E.2d 1363, 1365 (Ind. Ct. App. 1998)(trucking company was on notice of imminent litigation and preservation duties when its vehicle lost a drive shaft on the interstate, causing trailing cars to collide with it); <u>see also</u> <u>Burton v. Estate of Davis</u>, 730 N.E.2d 800 (Ind. Ct. App. 2000)(driver was subject to sanction for changing the position of his car post-collision because the accident created a cognizable duty to maintain evidence).

"[A] party is required to keep relevant evidence over which it had control and reasonably knew or could foresee was material to the litigation." <u>In re Old Banc One Shareholders Sec. Litig.</u>, 2005 U.S. Dist. LEXIS 32154, *9 (N.D. Ill. Dec. 8, 2005); <u>Marrocco v. General Motors Corp.</u>, 966 F.2d 220, 224 (7th Cir. 1992); <u>Smith v. Borg-Warner Auto. Diversified Transmission Prods. Corp.</u>, 2000 U.S. Dist. LEXIS 10200, *21 (S.D. Ind. July 19, 2000)("pre-litigation spoliation" is subject to sanction).

Courts have defined the contours of what is reasonable. In <u>Allstate Ins. Co. v. Sunbeam Corp.</u>, 53 F.3d 804, 806-07 (7th Cir. 1995), plaintiff's investigator disassembled a gas grill retrieved from a fire, and then disposed of its parts. The court determined this to be "unreasonable." Plaintiff should have delayed disposal until full examination by the adverse party, especially since the plaintiff had not yet determined its own view of the fire's cause. (<u>Id</u>. at 807). Spoliation was also the basis for default in the consolidated cases of <u>Marrocco v. General Motors Corp.</u>, and <u>Jones v. Goodyear Tire & Rubber co.</u>, 966 F.2d, 224 (7th Cir. 1992). In

Marrocco, an expert destroyed the evidence during invasive testing, warranting the dismissal of plaintiff's claim.  In Goodyear, the court entered default against the tire company because its employees poorly wrapped for shipment a "side ring" that was involved in a tire separation accident.  The ring was damaged in transit and then consequently lost.  Goodyear claimed the damage was unintentional and thus not sanctionable.  The trial court disagreed.  Even if the failure to safeguard the evidence was the fault of a shipping employee, the loss was still imputed to those who set policy of the company.  966 F.2d at 224-25.  The Seventh Circuit affirmed both decisions.

Large claims that Mobile Tool knew to preserve the unit 4068 upper boom remnants, and actually was preserving them, until a rogue destruction order caused their loss in October 2001.  Large contends that Mobile Tool made the point in discovery of insisting that it did not "formally investigate" the accident to that point.  (See Defendants' Answers to Plaintiff's Second Set of Interrogatories No. 12).   Large contends that the facts show that Mobile Tool did not conclude its own investigation into the accident's cause until shortly before March 15, 2006, when Mobile Tool received the reports of its two liability experts, Stephen Reynolds and Charles Manning.

In response to Large's claims, Mobile Tool incorporates its arguments made in its brief in support of its motion for summary judgment on Large's spoliation claim.  In this brief, Mobile Tool states as follows.

According to Davis Elliott's Rule 30(b)(6) corporate representative, Field Safety Director Richard Scruggs, part of the upper boom was cut at the accident scene to clear the electrical wires and prevent further injury.  (Scruggs June 23, 2005 Dep. at 15, 17).  Other portions were

dismantled at the scene.  (Scruggs June 23, 2005 Dep. at 26-27).  Most of the bucket and upper

boom were burnt, and warning decals were destroyed by the fire.  (Scruggs Jan 19, 2006 Dep. at

85).  All portions of the dismantled aerial lift and boom were initially transported to Davis

Elliott's Cloverdale facility.  (Scruggs June 23, 2005 Dep. at 26).  At some point after the

accident, portions of the aerial lift were taken to MTI insulated Products, Inc.'s Fort Wayne,

Indiana facility.

In October of 2001, sixteen months after the accident, Davis Elliott authorized repairs on

the aerial lift, portions of which were at MTI Insulated Products, Inc.'s Fort Wayne, Indiana

facility.[12]  A work order was prepared by Steve Weikart, who was instructed by his superiors at

the Fort Wayne facility to repair and retrofit the unit.[13]  The work was conducted between

October and December of 2001 in Fort Wayne, Indiana.  Some of the pieces of the aerial lift that

were undamaged or repairable were put back in service; others were discarded.  Davis Elliott

---

[12]  Mobile Tool seems to be implying that Davis Elliott had the final word on whether and
when the boom was repaired.  Such an implication is contradicted by the evidence and pleadings
in this case.  Notably, Davis Elliot has filed a counterclaim against Mobile Tool for spoliation
and has also filed a motion for summary judgment on this issue.  In support of its motion for
summary judgment, Davis Elliot states that "Mobile Tool did not seek Elliot's permission to
remove or transport the Bucket Truck, nor did Elliot take part in the decision to transport the
Bucket Truck."  (DE # 141 at 4).  As Davis Elliot points out, Mobile Tool was the owner of the
bucket truck, whereas Elliot was merely the lessee.  Additionally, Elliot needed the bucket truck
preserved to defend against Mobile Tool's indemnification claim, because proof of a
manufacturing defect would arguably remove the case from the reach of the indemnification
provisions in the lease.  To further confuse the issue, Mobile Tool asserts in its recently-filed
answer to Elliot's counterclaim that "Davis Elliott's own negligence caused any alleged injuries
and damages related to the spoliation."  (DE # 216 at 13).

[13]  Mobile Tool cites to the Weikart Deposition in support of this assertion, but indicates
that at the time of the filing of its brief, the deposition had not been transcribed.  Mobile Tool
further indicates that it will file a supplemental designation from the Weikart deposition when
the transcript and exhibits are available.

employee Russ Smith accepted the December 12, 2001 invoice and had authority to authorize and pay for the repair and retrofit work described in the December 12, 2001 invoice. (Scruggs June 23, 2005 Dep. at 92 and Dep. Ex. 8)

Mobile Tool also asserts that it was not asked to preserve any portion of the aerial lift, and that Large cannot demonstrate any actual prejudice from not visibly inspecting the upper boom of the aerial lift. Mobile Tool points out that numerous pictures of the accident scene were taken on June 19, 2000 and have been produced in discovery. Additionally Davis Elliott's insurer, Royal Insurance, prepared a detailed fire investigative report with narrative, measurements and additional pictures. (Scruggs Jan. 19, 2006 Dep. Ex. 4).

Mobile Tool states that contrary to Large's argument, the investigation into the accident was concluded shortly after the accident and long before the repair and refurbishment effort. Mobile Tool states that Davis Elliott did not conclude that the aerial lift was defective in design or manufacture and, in fact, continued to use this model of aerial lift in the field after Large's accident.

Mobile Tool next claims that it did not suppress material witnesses and documents. Mobile Tool argues that these allegations were previously ruled on when the court disposed of Large's discovery motions. However , Large points out that it has won every discovery motion but two.[14] Large was granted the right to get complete discovery responses from Mobile Tool that were up to two years overdue, and granted access to the suppressed spoliation facts in the Harrelson memo. Large states that after winning these motions, he worked to build a case.

_____

[14] Large was denied certain Rule 30(b)(6) depositions, and was denied an order that Mobile Tool had to search its vast document cache for a manufacturing report one of Mobile Tool's witnesses thought he at one point had in his files.

According to Large, only now, when the pattern of Mobile Tool's conduct is plainly in focus, has Large approached the court for sanctions.[15]

Large also reiterates numerous facts that Mobile Tool has totally failed to refute. Mobile Tool's most senior technical officer, Dave Grabner, investigated the Large accident days after it happened in June 2000, making detailed drawings of the damaged boom.  Mobile Tool requested return of the boom from Davis Elliott, and took possession of it in Indiana. Even before Large filed his suit, Mobile Tool ordered the preservation of the boom involved in Large's accident, as "evidence".  Mobile Tool CEO Van Walbridge thought the aerial lift was in fact still preserved in Mobile Tool custody as of March 2002.

Walbridge had been informed prior to that time that vehicles in accidents causing personal injury should be preserved until the statute of limitations had expired, which would have been June 2002. After CEO Walbridge and his defense counsel learned in 2002 of the evidentiary spoliation, counsel used a former Mobile Tool employee, Michael Harrelson, to investigate the destruction.  Harrelson's memo fully documents the spoliation, and facts surrounding it. Mobile Tool's senior employee with vehicle retrofit responsibility, Steve

---

[15]  In his motion for sanctions, Large describes several instances of how Mobile Tool ignored court-ordered discovery: Mobile Tool swore that it reused the metal knuckle when it refiberglassed unit 4068 in 2001 yet Weikart later testified that he was ordered by Brad Bowditch to scrap the knuckle; Mobile Tool was untruthful in claiming in interrogatory responses that it did not "formally investigate" the accident, which Large interprets as an attempt to avoid turning over Harrelson's investigation memo and justify, for two years, the non-production of Grabner's notes; Mobile Tool answered Large's spoliation interrogatory with circumstantial facts and refused to identify a single person with knowledge of the design, manufacture, or spoliation of unit 4068, including TECO/Mobile Tool/NEUCO employees such as Weikart, Deihl, Hess, Bowser, Harris, Caither, Heiny, Seitz or Johnson.

Weikart, knew he was to preserve the boom parts. Nonetheless, Brian Bowditch, Mobile Tool's leasing manager, intentionally ordered Weikart to scrap the boom parts in October 2001.

According to experts for both sides, the boom knuckle that Mobile Tool destroyed would have contained telling "witness marks," enabling experts to determine which of several probable fire scenarios actually occurred. The hoses to the boom, which Mobile Tool also destroyed, were either severed by the searing heat of the electrical contact, or were punctured; if the former, the accident could not have happened as plaintiff's expert, Dr. Manning, posited.  The condition of the hoses would have been a "physically verifiable fact" but for the spoliation of the boom parts.

Due to Mobile Tool's spoliation, no defense expert ever saw the physical evidence despite Mobile Tool's legal duty to preserve it, and actual orders to preserve it as "evidence." Mobile Tool did not in its Rule 26(a) responses, or court-ordered interrogatory answers, identify Grabner, Bowditch, Harrison or Weikart, or any other persons with key knowledge of the manufacture of the unit, or the spoliation of the boom parts.  Mobile Tool even failed to produce until after the discovery cut-off (1) the "unit file" which proves a manufacturing defect, and (2) the Grabner investigation notes which Large claims show the omission of retractile cables that were supposed to be in the boom, but were not.

After a careful review of the facts, evidence and record in this case, the court finds that sanctions against Mobile Tool are appropriate.  It is abundantly clear that Mobile Tool has engaged in contumacious conduct both with respect to discovery and with respect to the destruction of evidence.  The evidence shows, among other things,  that Mobile Tool has repeatedly lied about its ability to answer discovery requests. The evidence also shows that Mobile Tool ordered the destruction of the boom, then denied any specific knowledge of the

20

destruction and refused, until court-ordered, to turn over information that Large knew existed about the destruction of the boom.

The facts of this case come very close to supporting the grant of an outright default judgment against Mobile Tool.  However, as this court does not favor default, the court will permit the case to proceed to trial, with the following sanctions against Mobile Tool in place. First, with respect to Large's expert witnesses who will testify about the causes or potential causes of the fire, and the alleged defects in the boom which contributed to the fire, the court rules that they may not be cross-examined at trial regarding their inability to examine the destroyed parts of the boom.

Second, Mobile Tool's expert witnesses who would be called to testify regarding Mobile Tool's liability will not be permitted to testify at trial.  Lastly, the jury will be informed of the destruction of the evidence, either by way of stipulation or an instruction from the court, and be further informed that they may draw a negative inference from such destruction of evidence with respect to Mobile Tool's liability for Large's injury.

Conclusion

On the basis of the foregoing, Mobile Tool's motion to strike motion for sanctions is hereby DENIED.  Further, Large's motion for sanctions is hereby GRANTED.

The sanctions imposed are as follows:

(1)   Large's expert witnesses may not be cross-examined at trial regarding their inability to examine the destroyed parts of the boom;

(2)   Mobile Tool's expert witnesses on the issue of Mobile Tool's liability will not be permitted to testify at trial, and;

21

(3)   The jury will be informed of the destruction of the evidence and that they

may draw a negative inference from such destruction with respect to Mobile

Tool's liability for Large's injury.


 Entered: January 7, 2008.


                                        s/ William C.  Lee
                                        William C. Lee, Judge
                                        United States District Court